2516

Marcia K. MALLETT, Apellant-Respondent v.
John C. MALLETT, Respondent-Appellant.
(473 S.E. (2d) 804)

Court of Appeals

*Robert N. Rosen,* of *Rosen, Rosen & Hagood,* Charleston, *for appellant-respondent.*

*H. Fred Kuhn, Jr.,* of *Moss & Kuhn,* Beaufort, *for respondent-appellant.*

Heard Apr. 2, 1996.

Decided May 28, 1996. Reh. Den. Aug. 22, 1996.

*Per Curiam:*

In this domestic case, both parties appeal the trial judge's order concerning alimony, child support, equitable apportionment and attorneys fees. The wife also appeals the trial judge's refusal to recuse himself. We affirm in part, reverse in part and modify in part.

John C. Mallett (husband) and Marcia K. Mallett (wife) were married in 1971. The husband began working for State Farm Insurance in Ohio and the wife worked as a home economist. Four years later, the parties' first child was born. At that time, the husband received a promotion and the family relocated to Florida. The couple also decided the wife would no longer work outside the home. A second child was born in 1981. In 1983, the family moved to Hilton Head Island where the husband opened his own insurance agency. The agency flourished and the family soon began to enjoy a very comfortable lifestyle. The husband's gross annual income rose from $79,498 in 1985 to $441,191 in 1992. The parties separated in 1990 and divorced in 1992.

## I. Recusal of Trial Judge

The wife appeals the trial judge's refusal to recuse himself. On January 7, 1994, after learning of an alleged conversion between the trial judge and the wife's attorney, William Clark, the wife sent a letter to the trial judge requesting he immediately recuse himself from the case. The letter also complained of the trial judge's failure to timely issue a temporary support order. The trial judge immediately notified counsel for both parties of the wife's ex parte communication and his decision to treat her letter as a motion to recuse. On January 11, 1994, the trial judge issued a temporary order, pursuant to a hearing held in November, 1993. The temporary order awarded pendente lite alimony at $4,500 per month and child support of $2,000 per month.

On January 14, 1994, the trial judge issued an Order and Rule to Show Cause directing the wife to appear and show cause why he should recuse himself from the case. A hearing followed on January 21, 1994, in which attorney Clark, attorney Fuge and the wife submitted affidavits containing allega-

tions of bias and impartiality shown by the trial judge. Specifically, Clark's affidavit charged that in his presence, the trial judge referred to the present case as one of his "souvenir files" in which "Pete Fuge represented 'one of those Hilton Head women' who wanted money, and Clark[1] represented the husband, who said he didn't have any." The trial judge also allegedly stated Fuge, the wife's counsel, was his "chief nemesis" and that Fuge was "always bringing these cases that ought to be settled, and arguing for four days over issues that don't need to be heard." The wife's affidavit stated *inter alia:*

> Deponent does not feel she can receive a fair and impartial hearing because Judge Fanning had a bias against "Hilton Head women"; he has a very strong bias against her counsel; because of his actions in this case and the undue delay in issuing the Temporary Order; and because the Deponent asked Judge Fanning not to issue a temporary order because of the recent events and he issued the order anyway; and because the Judge issued the Rule to Show Cause against the Deponent which indicates to her a hostile personal attitude toward her.

At the recusal hearing, the trial judge made no effort to hide his irritation with the wife's lawyers. He refused to accept as true the affidavits presented by her counsel and criticized the accuracy of several statements in the affidavits. At one point the trial judge intimated he thought he was the one on trial. In the end, however, the judge went to great lengths to assure the wife he was not biased against her and would afford her a fair and impartial trial.

A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to, instances where he has a personal bias or prejudice against a party. *Murphy v. Murphy,* — S.C. —, 461 S.E. (2d) 39 (1995). Such bias must stem from an extrajudicial source and result in decisions based on information other than what the judge learned from his participation in the case. It is not enough for a party seeking disqualification to simply allege bias. The party must show some evi-

---

[1] Apparently, Judge Fanning mistakenly believed Clark represented the husband. Clark, however, represented the wife along with Fuge.

dence of bias or prejudice. *Roper v. Dynamique Concepts, Inc.*, 316 S.C. 131, 447 S.E. (2d) 218 (Ct. App. 1994). If there is no evidence of judicial prejudice, a judge's failure to disqualify himself will not be reversed on appeal. *Ellis v. Procter & Gamble Dist. Co.*, 315 S.C. 283, 433 S.E. (2d) 856 (1993). In the final analysis, while appellate courts will accord "great weight to the trial judge's assurances of his own impartiality, [they will] find a judge's impartiality might reasonably be questioned when his factually findings are not supported by the record." *Id.* at 285, 433 S.E. (2d) at 857.

In *Shaw v. State*, 276 S.C. 190, 277 S.E. (2d) 140 (1981) our Supreme Court addressed the authority of a trial judge to resolve a motion for disqualification where he is the subject. The court held:

> Our Court has apparently not specifically considered the authority of a judge to resolve a motion for disqualification of which he is subject. After much consideration of the authorities, we conclude that as a general rule the judge, in determining whether to proceed, must accept as true the factual allegations of a motion to disqualify. However, this does not prevent the judge from exercising his right to consider the legal sufficiency of those facts. (Citations omitted.) Additionally, the fair meaning of any remark must be interpreted in the light of the context in which it is uttered in determining whether the remarks show personal bias or prejudice on the part of the judge sufficient to require that he be disqualified. (Citation omitted.)

While our Supreme Court has not extensively treated the question of the legal sufficiency of facts necessary to warrant the disqualification of a judge, the federal courts have done so. In the federal arena, the courts have held, as has our Supreme Court, that the alleged bias must be personal as distinguished from judicial. *Davis v. Board of Sch. Comm'rs*, 517 F. (2d) 1044 (5th Cir. 1975); *Roper*, 447 S.E. (2d) 218. Likewise, the bias must stem from extrajudicial sources and result in a decision on the merits based on considerations other than what the judge learned from his participation in the case. *Id.* A motion to recuse may not be predicated on the judge's rulings in the case before him or on rulings in a related

case, nor on his demonstrated tendency to rule in any particular manner, or on a particular judicial leaning or attitude derived from his experience on the bench. *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed. (2d) 778 (1966); *Berger v. United States*, 255 U.S. 22, 31, 41 S.Ct. 230 232, 65 L.Ed. 481 (1921).

It is axiomatic that the expectation of a fair and impartial tribunal is a basic tenet of all cherished notions of due process embodied in the United States Constitution. *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). With these principles in mind, we review the affidavits presented at the recusal hearing for legal sufficiency. A review of the affidavits presented causes this court some concern. We disagree with the trial judge's view that Clark's allegations were "pure trivia." We question whether the trial judge could impartially decide the recusal issue given his apparent combative and defensive attitude exhibited during the recusal hearing. It does not appear to us unreasonable for the wife to have questioned the trial judge's impartiality in light of Clark's allegations.[2] We are convinced prudence and judiciousness would have dictated the trial judge disqualify himself. Nevertheless, we see no indication from the record the trial judge ever expressed an opinion on the merits of the case prior to his decision. *See Davis*, 517 F. (2d) 1044. It is, therefore, not altogether clear to us that the trial judge's remarks and actions meet the bias test for recusal, nor are the trial judge's findings so unsupported by the record as to manifest impartiality. The fact a trial judge ultimately rules against a litigant is not proof of prejudice by the judge, even if it is later held the judge committed error in his rulings. *Reading v. Ball*, 291 S.C. 492, 354 S.E. (2d) 397 (Ct. App. 1987).

In any event, the parties, through their respective counsel, agreed at oral arguments that the trial judge's actions did not prevent the parties from fully litigating their respective claims. The wife's counsel specifically requested this court not to remand the case for a new trial, but decide the issues based on the appellate record. Because this is an equity case and the attorneys have asked us to decide the case on the record, we decline to remand this case for a

---

[2] At the same time, we do not approve of the manner in which the wife made her complaint.

new trial irrespective of our finding on the recusal issue. For purposes of this appeal, we view the recusal issue as moot.

## II. Alimony

Both the husband and the wife appeal the trial court's award of $4,500 monthly periodic alimony to the wife.

Alimony is a substitute for the support which is normally incident to the marital relationship. *Nienow v. Nienow*, 268 S.C. 161, 232 S.E. (2d) 504 (1977). Ordinarily, the purpose of alimony is to place the supported spouse, as nearly as is practical, in the position of support he or she enjoyed during the marriage. *Johnson v. Johnson*, 296 S.C. 289, 372 S.E. (2d) 107 (Ct. App. 1988), *cert. denied*, 298 S.C. 117, 378 S.E. (2d) 445 (1989).

This marriage lasted twenty-one years. The wife worked the first four years of the marriage and has a college degree. However, with the husband's consent, she left the work force in 1975 and spent the last seventeen years of marriage in the home caring for the parties' children while the husband pursued his insurance career. The husband's career proved financially successful and the couple enjoyed an upper-middle-class lifestyle on Hilton Head Island. When the parties divorced, the husband had a gross annual income of $441,191.[3]

We agree with the trial court that the husband provided the wife "with an affluent life style to which she has become accustom[ed] over the past twenty-two years. [The husband's] income is more than sufficient to sustain such a life style and to live comfortably himself." The trial court also found the wife's age, current work experience and standard of living during this marriage as well as the husband's assets dictate that she not be required to re-enter the work force. The court, nevertheless, found the wife was an able-bodied adult, who had since the seperation of the parties had ample time to complete any further education or training which she felt would have been necessary for her to re-enter the work force. It concluded, "she is entitled not to work if she so desires, her ability to work is [a] factor to be considered in setting alimony and it has been considered together with all other applicable factors."

---

[3] We are uncertain of husband's net income.

In her financial declaration dated August 8, 1994, the wife showed total monthly expenses for herself and the parties' minor son of $8,302. She noted that with the receipt of $6,500 in alimony and child support, she had a monthly deficit of $1,802. An award of alimony should not be set so high as to take away from the supported spouse, who has no good reason not to seek gainful employment, all incentive to find such employment. *See Crim v. Crim*, 289 S.C. 360, 345 S.E. (2d) 515 (Ct. App. 1986). Notwithstanding the concern, we hold that in view of the unsettled nature of the wife's earning potential, the fact that the parties' teenage son could benefit from the wife being in the home full-time, and the husband's more than adequate income, he should be required to fully meet her needs, at least for the time being.[4] We therefore modify the wife's alimony award to $6,300 per month. In so doing, we are cognizant of the fact that we are not requiring the wife to contribute toward the support of the minor child in her custody, who, as noted below, will receive generous support from the husband.

### III. Child Support

Both the husband and the wife appeal the trial court's award of $2,000 per month child support for the parties' teenage son.[5]

The husband contends the award is excessive because it greatly exceeds the reasonable needs of the child. Due to the husband's income, the Child Support Guidelines do not cover this case. The general law, however, is well settled that a child is entitled to live and be supported in a lifestyle commensurate with the current income of his parents. *Miller v. Miller*, 299 S.C. 307, 384 S.E. (2d) 715 (1989) (child support award should be sufficient to provide for the needs of the children and to maintain the children at the standard of living they would have been provided but for the divorce). We hold

---

[4] We specifically leave open an avenue for the husband to return to court after the wife has had an opportunity to fully explore employment opportunities and/or the parties' son can no longer benefit by the wife being in the home full-time.

[5] The court also ordered the husband to pay directly to the parties' emancipated daughter her college expenses. According to the wife's November 1993 Financial Declaration, these expenses amount to over $17,000 per year. Neither party appeals this aspect of the child support order.

monthly child support of $2,000 is reasonable considering the husband's income and the lifestyle the child has enjoyed and is entitled to enjoy in the future.

The wife contends the trial court erred in failing to require the husband to maintain health and life insurance for the benefit of the parties' son. We order the husband to maintain health insurance for his son until he is emancipated. However, we affirm the trial court's refusal to require the husband to maintain life insurance for the benefit of his children. While the court may require a supporting parent to maintain life insurance for the benefit of a minor child, there must be compelling reasons to do so. *Harlan v. Harlan*, 300 S.C. 537, 389 S.E. (2d) 165 (Ct. App. 1990). We find no compelling reason in this case to require life insurance. The husband has more than adequate income to meet his support obligations and there is no indication he has shunned his child support obligation in any way.

### IV. Equitable Apportionment

The husband contends the trial court erred when he awarded the wife 50% of the marital estate. Although we think the award was generous, we find no abuse of discretion.

The doctrine of equitable distribution is based on a recognition that marriage is, among other things, an economic partnership. *Johnson v. Johnson*, 296 S.C. 289, 372 S.E. (2d) 107 (Ct. App. 1988). Upon dissolution of the marriage, property acquired during the marriage should be divided and distributed in a manner which fairly reflects each spouse's contribution to its acquisition, regardless of which spouse holds legal title. *Id.* Admittedly, the wife did not work outside the home after the parties' first child was born. However, our courts have long recognized a "homemaker's equity" in marital property where, as here, one spouse has foregone career opportunities, at the behest of the primary wage-earning spouse, and throughout the marriage has remained in the home to rear children and provide a suitable environment for the family. *Parrott v. Parrott*, 278 S.C. 60, 292 S.E. (2d) 182 (1982). Therefore, we affirm the trial court's equal apportionment of the marital estate.

### A. *Business and Home*

The wife contends the trial court erred in its computation of the value of the husband's business and the marital home. The wife's expert valued the husband's insurance business as of the date of the filing of this action at $158,928. He also testified the value of the business at the time of the hearing had decreased to $124,564. For the purposes of equitable apportionment, the trial court purposefully used the value of the business at the time of the hearing rather than the higher value at the time of the filing of this action. The trial court reasoned that the business asset represented "propriety equity" in policies owned by State Farm, and "although value is assigned to this business, it cannot be realized by sale." The court found the value of this marital asset "ha[d] declined through no fault of either [party]." Marital property is valued as of the date of the filing of the complaint. S.C. Code Ann. § 20-7-473 (Supp. 1995); *Panhorst v. Panhorst,* 301 S.C. 100, 390 S.E. (2d) 376 (Ct. App. 1990). Nevertheless, it would be grossly unfair to value this asset as of the date of the commencement of the action. *See Johnson,* 296 S.C. 289, 372 S.E. (2d) 107 (appellate court will look to the overall fairness of a distribution award). We therefore find no abuse in the court's valuation of the insurance agency business asset.

The wife also claims error in the trial court finding the marital home awarded to her had an equity value of $80,339. This was clearly a mathematical error because the trial court valued the home at $200,000. The house has a mortgage with a principal balance of $164,661.40, leaving equity of only $35,338.60. We correct this award accordingly.

### B. *Termination Benefits*

Both parties argue the trial court erred in its allocation of the husband's "termination benefits." We agree with the husband and reverse the trial court.

When the husband ceases to be employed by State Farm, he will be entitled to "termination benefits" payable every month for sixty months. The amount of these benefits is to be based on the husband's earnings during the year prior to termination. The husband argues because the benefits are based *only* on his earnings during the year prior to his termination, a time well beyond the date of valuation, the benefits cannot

be considered marital assets. He likens the termination benefits to severance pay. *See Fisher v. Fisher,* — S.C. —, 462 S.E. (2d) 303 (Ct. App. 1995) (severance pay, unlike retirement benefits, is not marital property).

This precise issue was considered by the Arkansas Supreme Court in *Lawyer v. Lawyer,* 288 Ark. 128, 702 S.W. (2d) 790 (1986). In that case, as here, the husband's employment contract with State Farm provided that upon termination by either party, he would receive 60 monthly installments based upon a specified percentage of his earnings during his final year of employment. 702 S.W. (2d) at 791. In rejecting the wife's claim to an interest in the termination pay, the court stated:

> The five-year termination benefits, described earlier, begin at termination if the agent has been employed for two years or more. . . . We are unable to agree with the chancellor's ruling that the five-year termination payments are vested marital property in this case. We are not concerned with State Farm's true retirement plan, only with the 60-month stopgap that is evidently *intended to compensate the agent for lost renewal commissions* when the contract is terminated by the employer or by the agent himself. Lawyer was born in 1946 and will not reach 65 until the year 2011, twenty-five years in the future. When the suit was filed he had been with State Farm for 10 years. . . . There is no indication that he is likely to terminate his association with State Farm. It would be next to impossible to put a present value on the possibility that Lawyer will receive termination payments before he reaches retirement age. Certainly no such estimate is in the record as abstracted. (Emphasis added.)

*Id.* at 792.

In the case of *Mears v. Mears,* 305 S.C. 150, 406 S.E. (2d) 376 (Ct. App. 1991), we adopted the reasoning of *Lawyer* for the proposition that "we agree with those jurisdictions that hold the proper classification of payments related to termination of employment depends on the purpose of the payments." *Id.* at 156, 406 S.E. (2d) at 380. We further agree with the Arkansas Court that the purpose of the pay-

ments at issue is to replace renewal commissions the husband will necessarily earn after the date of commencement of this action. We therefore reverse the trial court's inclusion of these payments in the marital estate.

As a result of the above adjustments, the marital estate should have been valued at $321,140.60 instead of $366,141. In like manner, the wife's one-half share should have been $160,570.30 instead of $173,070.50 as found by the trial court. The items awarded the wife include the equity in the marital home of $35,338.60, the household goods and furnishings valued at $8,240, the wife's jewelry valued at $2,000 and an automobile valued at $20,000. The total value of these items should have been found to be $65,578.60 instead of the $123,579.00 found by the trial court. We accordingly modify the court's order to require the husband to pay to the wife the sum of $94,991.00 instead of $49,491.50 to effectuate an equal division of the marital estate.

## V. Attorney Fees

Both the husband and the wife appeal the trial court's order requiring the husband to contribute $16,500 towards the wife's attorneys' fees.

In *Glasscock v. Glasscock*, 304 S.C. 158, 403 S.E. (2d) 313 (1991) the Supreme Court outlined the factors to consider when determining the reasonableness of attorney fees. They are: (1) nature, extent, and difficulty of the case; (2) time necessarily devoted to case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; and (6) customary legal fees for similar services. The trial court found this case had "nothing remarkable or unusual about it." We disagree with that finding only to the extent the case litigated the novel issue of the treatment of the husband's termination benefits. We note, however, the husband, not the wife, ultimately prevailed on the issue. In awarding attorney fees, the trial court disallowed the wife's costs, expenses and attorney fees associated with the motion to recuse amounting to $2,625, finding the motion "unsuccessful and frivolous." The court disallowed another $1,056 in attorney fees and costs incurred "on witnesses whose testimony was not used." Finally, the court considered the fact the wife employed two attorneys as being an unnecesary expense and

disallowed a request for $2,685. This court will not criticize a party for hiring more than one attorney, provided their work is not duplicated and the complexity of the case demands it. Except for the personalities involved here, we are not convinced the case otherwise demands the attention of two attorneys. The estate was not large, and due to the long marriage and the parties' contributions, an equal division of the marital estate was almost evident. In light of the beneficial results obtained by the wife on appeal, and our finding there was merit to the wife's recusal motion, we modify the attorney fee award to replace fees and costs associated with the recusal and order the husband to reimburse the wife $24,000 in attorneys' fees and costs, which includes all attorney fees and costs the wife may be entitled to in this appeal. In establishing the award, we note the wife is realizing $94,991 in equitable distribution and, further, the husband was ordered to pay $7,200 in expert witness fees.

### VI. Conclusion

In conclusion, we modify the trial court's order to award the wife $6,300 monthly permanent periodic alimony; order the husband to maintain health insurance for the parties' minor son; and award the wife a cash award of $94,991 to equalize her share of the marital estate. We also order the husband to pay $24,000 towards the wife's attorneys' fees and costs. We reverse the trial court's finding that the termination benefits are marital property. All remaining issues are affirmed.

Affirmed in part, reversed in part and modified in part.

CURETON, GOOLSBY and ANDERSON, JJ., concur.