Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/14/2017 09:12 AM CDT

Jay Bergmeier, appellant and cross-appellee,
v. Nanci B. Bergmeier, appellee
and cross-appellant.

___ N.W.2d ___

Filed April 21, 2017.    No. S-15-1189.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.
2. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
3. **Divorce: Property Division.** The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case.
4. ____: ____. Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.
5. ____: ____. Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate.
6. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions on the matters at issue. When

evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

7. **Alimony.** The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in Neb. Rev. Stat. § 42-365 (Reissue 2016) make it appropriate.

8. **Alimony: Appeal and Error.** In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result.

9. **Alimony.** The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support.

10. ____. In an alimony award, the ultimate criterion is one of reasonableness.

Appeal from the District Court for Douglas County: Marlon A. Polk, Judge. Affirmed in part as modified, and in part reversed and remanded with directions.

Aaron F. Smeall, of Smith, Slusky, Pohren & Rogers, L.L.P., for appellant.

Benjamin M. Belmont and Wm. Oliver Jenkins, of Brodkey, Peebles, Belmont & Line, L.L.P., for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Miller-Lerman, J.
NATURE OF CASE
Jay Bergmeier filed a complaint for dissolution of marriage, and Nanci B. Bergmeier filed a "counter-complaint." The district court for Douglas County filed a dissolution decree in which it, inter alia, determined that Jay's future "termination payments" and "extended termination payments" that he was expected to receive after the dissolution as a "captive agent" of State Farm Insurance Company (State Farm) were marital

property and awarded Nanci a portion thereof. The district court also divided the parties' liabilities and other assets, and it awarded Nanci alimony and attorney fees. Jay appeals, and Nanci cross-appeals. We affirm in part as modified and in part reverse, and remand with directions to the district court as set forth below.

## STATEMENT OF FACTS

Jay and Nanci were married in August 1981. Jay and Nanci adopted two children during their marriage; the parties' children were no longer minors at the time of the divorce proceedings.

At the time they married, Jay and Nanci were both teachers. During the marriage, Nanci left teaching to stay home and raise the parties' children. During this time, Nanci also obtained a master's degree in health education.

During the marriage, Jay also left teaching and started working in insurance in 1986. Jay entered into an agreement with State Farm pursuant to State Farm's "Form AA4," and thus, Jay became a "captive agent" of State Farm. Although a signed copy of Form AA4 is not in evidence, the record contains an unsigned copy of Form AA4. As a captive agent, Jay does not own the insurance policies in the way an independent agent would; instead, the policies are owned by State Farm. Furthermore, Jay does not own the clients' accounts or renewal rights. On January 7, 2014, State Farm's counsel sent Jay a letter in response to Jay's "request for assistance regarding compensation payments due under [Jay's] Agent Agreement." The letter states:

> You have no proprietary interest in the business generated under your State Farm Agent's Agreement. The policies credited to your account belong to State Farm and may be reassigned by State Farm to the accounts of other State Farm agents. The physical customer records and the right to use those records to solicit renewals—commonly referred to as the "expirations"—belong to State Farm.

The letter goes on to explain that pursuant to section II of Form AA4,

> agents are compensated for soliciting new business and for servicing existing business. Service compensation is paid for providing personal service to State Farm policyholders, assisting adjusters in reporting and handling claims, and promoting and advancing the interests of the Company. Service compensation is earned on a day to day basis.

Under section III of Form AA4, an agent has the right to terminate the agreement. After termination, the agent may not act or represent himself or herself in any way as an agent or representative of State Farm, the agent must return all property belonging to State Farm within 10 days after termination of the agreement, and the agent may not compete with State Farm for a period of 12 months following termination of the agreement.

Under Form AA4, an agent, upon certain contingencies being met, is entitled to two forms of termination payments: termination payments and extended termination payments. Termination payments are described in section IV of Form AA4. Section IV provides that termination payments will be made in the event the agreement is terminated 2 or more years after its effective date. The January 7, 2014, letter from counsel for State Farm to Jay describes these termination payments as follows:

> Under Section IV, you have a contract right to termination payments if you comply with certain conditions at the time the Agreement is terminated. Termination payments are based on the service compensation paid to the agent in the twelve month period preceding the termination of the Agreement. Termination payments are paid in sixty monthly installments beginning in the month next following the termination of the Agreement.

Section IV further states that an agent may qualify for termination payments so long as all property belonging to State

Farm has been returned within 10 days following the termination and the agent does not compete with State Farm for a period of 12 months.

Extended termination payments are described in section V of Form AA4. Section V provides that an agent qualifies for extended termination payments if the agent qualifies for termination payments under section IV and if at the time of termination of the agreement the agent was 62 years of age or older, had at least 20 years of service as a State Farm agent, and had 10 years of continuous service as a State Farm agent immediately preceding the date that the agreement was terminated. With respect to extended termination payments, the January 7, 2014, letter states: "Extended termination payments, like termination payments, are based on the service compensation paid in the twelve month period preceding the termination of the Agreement. Extended termination payments begin in the 61st month following the termination of the Agreement and continue for the lifetime of the agent." Section V provides that if the agent is 65 years of age or older at the time of termination of the agreement, the agent will receive the full amount of the extended termination payments. However, if the agent is 62, 63, or 64 years of age at the time of termination, the extended termination payments will be actuarially reduced.

In 2005, the parties formed Bergy Properties, L.L.C. The parties were the managing members of Bergy Properties, and they each held a 50-percent interest in the business. Bergy Properties owns an office building in Omaha, Nebraska, that was appraised at $1.4 million.

On May 7, 2012, Jay filed a complaint for dissolution of marriage. Nanci filed her answer and counter-complaint on May 31. Jay filed his reply to the counter-complaint on June 4.

A trial was held on January 12, March 11, and April 2, 2015. Evidence was adduced at trial regarding the parties' assets and liabilities. Jay generally testified regarding his insurance

business. Jay operated his business under the name "Jay M. Bergmeier Agency, Inc.," and it reported: $1,018,059 in revenues in 2010; $957,318 in revenues in 2011; $867,538 in revenues in 2012; and $864,679 in revenues in 2013. Jay testified that he was still operating his insurance business at the time of trial. Nanci testified that at the time of trial, she was working part time as a substitute teacher and part time for the National Safety Council.

On August 11, 2015, the district court filed the decree of dissolution of marriage. In the decree, some awards were listed by a narrative under individually numbered paragraphs. Some assets and liabilities were covered by individually numbered paragraphs, but others were contained in a table.

With respect to alimony, the court ordered Jay to pay Nanci $2,000 per month and continuing until the last day of the month in which Nanci reaches the age of 65, until she remarries or dies, until Jay begins receiving termination payments, or until further order of the court, whichever occurs first. With respect to real and personal property, each party was awarded insurance policies held in their respective names.

As noted, the decree set forth a table in which it listed certain of the parties' marital assets and marital liabilities. In the table, the district court designated which party would receive which assets and liabilities. The table, in summary, indicates that Jay was awarded a timeshare in Arizona, Nanci was awarded a timeshare in Missouri, and the parties were each awarded a 25-percent share of the parties' 50-percent interest in a timeshare in Mexico. With respect to vehicles, Jay was awarded a Mitsubishi, a Suburban, two "Sea Doos," and a "Shorelander" trailer, and he was ordered to pay the lease on a Buick. Nanci was awarded a paddle boat and trailer, and she was ordered to surrender the lease on a Subaru. With respect to bank accounts, Jay and Nanci were each awarded 50 percent of the joint account at Bank of Bennington. Jay was awarded the account at State Farm Credit Union. Nanci was awarded the account at First National Bank and the checking

and savings accounts at US Bank. Jay and Nanci were each awarded his or her own 401K and Roth IRA accounts. Jay was awarded the two businesses formed during the marriage: the Jay M. Bergmeier Agency and Bergy Properties. Jay was assigned all of the parties' liabilities.

Regarding property not included in the table, the district court awarded Jay four season tickets to University of Nebraska-Lincoln football games and Nanci two season tickets. The parties were awarded household goods, furniture, and jewelry that were in their respective possession at the time of the dissolution proceedings. Each party was ordered to be responsible for any debts that party incurred since the parties' separation on January 4, 2013.

With respect to equalizing the marital estate, in a paragraph titled "Equalization of Marital Estate," the district court stated:

Having equitably divided the marital estate, exclusive of [Jay's] Termination and Early Termination Payments, the Court finds that the resulting net value of the Parties' marital estate, is -$52,960.00 and that each party shall be responsible for fifty percent (50%) of such deficiency[.] The Court further finds that [Nanci's] portion of such deficiency shall be paid to [Jay] by reducing [Nanci's] interest in [Jay's] Termination Payments, as set forth hereinafter.

With respect to termination payments, the district court stated in the decree:

The Court finds that [Jay's] Termination Payments are a marital asset subject to division. The Court further finds that the value of the marital portion of such assets [is] $802,040.00. This amount is determined by calculating the termination payments [Jay] would have received had [Jay] retired in January of 2014. Each party is awarded 50% thereof with [Nanci's] portion being reduced by $26,480.00. As such, [Nanci] is awarded $374,540.00 of [Jay's] Termination Payment. Such amount shall be

paid to [Nanci] by [Jay] at such time as [Jay] begins receiving such payments. [Jay] shall remitting [sic] 50% of his Termination payments received each month within 15 days of receipt and shall continue to remit such percentage each month until such time as [Jay] has paid to [Nanci] the sum of $374,000.00 as required hereunder.

With respect to "extended termination payments," the district court stated in the decree:

The Court finds that [Jay's] Extended Termination Payments are a marital asset subject to division. In the event [Jay] should qualify for and then receive such Extended Termination Payments, [Jay] shall remit 50% of such Extended Termination Payments amount received each month within 15 days of receipt and shall continue to remit such payment each month until such time as [Jay] or [Nanci] shall die, subject to the joint survivor option hereinafter set forth. [Jay] shall be required to name [Nanci] as his surviving spouse beneficiary for all such Extended Termination Payments, through the joint and survivor option which [Jay] shall be required to elect.

The district court also awarded Nanci attorney fees in the amount of $12,500.

On August 17, 2015, Nanci filed a motion to alter or amend and/or motion for new trial. After a hearing on the motion, on November 17, the district court filed its order, in which it denied Nanci's motion for new trial and granted in part her motion to alter or amend. The district court stated:

[Nanci's] Motion to Alter or Amend shall be granted in part to provide that to the extent that the Decree does not include all debts as set forth in [Nanci's] Credit Report and [Nanci's] List of Debts marked as Exhibit 95 and Exhibit 96 respectively, offered and received into evidence, it shall be amended to provide that in addition to the debts set forth in the Decree that [Jay] is to

assume, pay, hold [Nanci] harmless, and refinance said obligations to remove [Nanci] from any liability thereon, specifically on those debts set forth on Exhibit 96 . . . as well as those debts on [Nanci's] Credit Report (Exhibit 95), except her JC Penny and Younkers card that were her individual liability.

Jay appeals, and Nanci cross-appeals.

## ASSIGNMENTS OF ERROR

Jay claims, restated, that the district court erred when it determined that the termination payments and extended termination payments were marital assets and awarded Nanci a portion thereof.

Nanci claims on cross-appeal that the district court erred when it (1) failed to order Jay to pay the amount of his termination payments awarded to Nanci in a lump sum or, in the alternative, in payments commencing immediately upon the entry of the decree with postjudgment interest; (2) assigned 50 percent of the responsibility of the deficiency in the marital value to Nanci; and (3) awarded Nanci alimony until she turned 65 years old instead of at the commencement of her receipt of termination payments.

## STANDARDS OF REVIEW

[1,2] In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Devney v. Devney*, 295 Neb. 15, 886 N.W.2d 61 (2016). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Sellers v. Sellers*, 294 Neb. 346, 882 N.W.2d 705 (2016). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Devney v. Devney, supra*.

## ANALYSIS

*Termination Payments and Extended*
*Termination Payments.*

Jay claims that the district court erred when it treated the termination payments and extended termination payments as marital property. We find no merit to this assignment of error.

As an initial matter, we are aware that other jurisdictions have considered the contract at issue in this case—State Farm's Form AA4. There is a split among the other jurisdictions as to whether the termination payments and extended termination payments under the contract are marital or nonmarital property. Some jurisdictions have determined that the termination payments are marital property. See, *In re Marriage of Skaden*, 19 Cal. 3d 679, 566 P.2d 249, 136 Cal. Rptr. 615 (1977); *Ray v. Ray*, 916 S.W.2d 469 (Tenn. App. 1995); *Matter of Marriage of Wade*, 923 S.W.2d 735 (Tex. App. 1996); *In re Marriage of Garceau v. Garceau*, 232 Wis. 2d 1, 606 N.W.2d 268 (Wis. App. 1999). Other jurisdictions have determined that the termination payments are nonmarital property. See, *Lawyer v. Lawyer*, 288 Ark. 128, 702 S.W.2d 790 (1986); *In re Marriage of Frazier*, 125 Ill. App. 3d 473, 466 N.E.2d 290, 80 Ill. Dec. 838 (1984); *Mallett v. Mallett*, 323 S.C. 141, 473 S.E.2d 804 (S.C. App. 1996). We agree with the reasoning of those jurisdictions that have determined that termination payments are marital property.

Jay argues that the termination payments and the extended termination payments should be classified as nonmarital property, because at the time the decree was entered, it was uncertain whether Jay would actually receive the payments and, if so, what the value of the payments would be. While it is true that Jay does not have an indefeasible right to a certain benefit, namely the termination payments and the extended termination payments, he does have an accrued contractual right subject only to minimal qualifying conditions, including actual termination and delivery of State Farm's property. Jay may choose to squander this contractual right or forfeit it by violating

a noncompete provision in the contract, but that should not affect its status as marital property. We are persuaded that the State Farm contract, which was acquired during the marriage, had a substantial value and was properly considered a part of the marital estate.

As noted above, we are aware that other jurisdictions have determined that termination payments under this same contract have no value for division as marital property. These jurisdictions have focused on the fact that the actual value of the contract depends on the activities of the husband who is in the relationship with State Farm that occur after the marriage has been dissolved. See, e.g., *Lawyer v. Lawyer, supra*; *In re Marriage of Frazier, supra*. We choose not to adopt the conclusion that, for that reason, the wife should be denied any interest whatsoever in a substantial asset which was acquired during the marriage. Accordingly, we determine that the district court did not err when it determined that the termination payments and extended termination payments are marital property. We reject Jay's assignment of error urging a contrary conclusion.

Although we determine that the district court correctly classified both termination payments as marital property, we determine that on this record, the district court abused its discretion when it assigned the specific value to the termination payments. The district court assigned a value to the termination payments based on what the value would have been if Jay had terminated his contract with State Farm in January 2014. But Jay did not terminate his relationship with State Farm in January 2014, and the record shows that he continued to work for State Farm at the time of trial in 2015. We further note that the court did not determine a present value of the asset as of the time of trial, which approach has been found elsewhere not to be an abuse of discretion. See *Ray v. Ray, supra*. Accordingly, assigning a specific value to the termination payments as of January 2014 was improper because, inter alia, the value chosen was stale, it was not warranted by the facts, and

the actual value depends on factors that have not yet occurred, such as the date of Jay's termination and total sales for the 12 months immediately preceding his termination.

Additionally, we determine that the court abused its discretion when it awarded Nanci 50 percent of the termination payments and the extended termination payments if and when Jay receives them at some point after the marriage has been dissolved. Instead of 50 percent, in keeping with our jurisprudence in this area, we believe Nanci's percentage of termination payments should reflect the duration the asset was possessed during the course of the marriage. That is, payments to Nanci are dependent on the amount of time that Jay will have been in a working relationship with State Farm both during and after the parties' marriage when Jay starts receiving termination payments.

As to how to calculate what percentage of the termination payments Nanci should be awarded, we look for guidance to divorce cases involving pensions. See *Klimek v. Klimek*, 18 Neb. App. 82, 775 N.W.2d 444 (2009). See, also, *Webster v. Webster*, 271 Neb. 788, 716 N.W.2d 47 (2006); *Koziol v. Koziol*, 10 Neb. App. 675, 636 N.W.2d 890 (2001). In these cases, it has been noted that the marital estate includes only that portion of the pension which is earned during the marriage, and contributions to pensions before marriage or after dissolution are not assets of the marital estate. See *Koziol v. Koziol, supra*. The cases have used the "coverture formula" to determine the marital portion, which has been described as follows:

> "Simplified, the coverture formula provides that the numerator of the fraction used to determine the marital portion is essentially the number of months of credible service of the employed spouse while married and therefore is the pension contribution *while married* and that the denominator is the total number of months that the spouse has [been] or will be employed which resulted in the pension the employee will receive. This denominator

number includes and will include the time the employed spouse worked before, during, and after the marriage."
*Klimek v. Klimek*, 18 Neb. App. at 93-94, 775 N.W.2d at 454, quoting *Koziol v. Koziol, supra* (emphasis in original). The ex-spouse is awarded a percentage of the marital portion. We determine that this formula should be applied in this case.

Therefore, we reverse the portion of the district court's decree in which it assigned a specific value to the termination payments and awarded Nanci 50 percent of all the payments. We direct the district court to amend the order of dissolution to provide that when termination payments commence, the marital portion of the termination payments and extended termination payments shall be determined using the formula set forth above, and to order that Nanci receive 50 percent of the marital portion of the termination payments and extended termination payments. We further direct the district court to order that Jay shall remit to Nanci her percentage of the termination payments and extended termination payments, if and when he starts to receive them, each month within 15 days of Jay's receipt of the payment.

We acknowledge that Nanci claims on cross-appeal that the district court erred when it ordered that Jay pay Nanci her portion of the termination payments as he receives them and that Nanci contends that the district court "abused its discretion in failing to order Jay to pay the amount of his termination payments awarded to Nanci in a lump-sum, or in the alternative in payments commencing immediately upon entry of the Decree with post-judgment interest." In view of our determinations set forth above, we reject this assignment of error, and we direct the district court to award Nanci her percentage of the termination payments as set forth above.

*Division of Marital Property Other Than*
*Termination Payments and Extended*
*Termination Payments.*

Nanci generally claims on cross-appeal that the district court erred in its division of the marital property, exclusive

of the termination payments and extended termination payments. For the reasons set forth below, we agree with certain of Nanci's claims.

[3,4] We first review general standards relating to property division. Under Nebraska's divorce statutes, "[t]he purpose of a property division is to distribute the marital assets equitably between the parties." Neb. Rev. Stat. § 42-365 (Reissue 2016). The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Sellers v. Sellers*, 294 Neb. 346, 882 N.W.2d 705 (2016). We have stated that under § 42-365, the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Sellers v. Sellers, supra*.

With respect to the first step—classifying the parties' property as marital or nonmarital and setting aside the nonmarital property to the party who brought that property to the marriage—Nanci argues that the district court abused its discretion when it classified certain debts as marital property, including a certain Slate/Chase credit card, a certain United Mileage Plus credit card, a GE Capital Retail Bank credit card, a Younkers credit card, and a US Bank line of credit. The total balance of these debts amounts to $42,832.83. Nanci argues these debts should have been classified as nonmarital property because they were incurred by Jay after the parties separated. In support of her argument that these debts were incurred after the parties were separated, Nanci points to Jay's answers to interrogatories provided to Nanci in September 2012, in which Jay provided a list of credit cards he believed showed the debt incurred during the marriage. Nanci asserts that these additional debts were presented to her for the first

time at trial, and she testified that she had no prior knowledge of these additional debts. Jay, on the other hand, testified that these debts were incurred during the marriage before the parties separated.

[5,6] We have stated that generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). The burden of proof rests with the party claiming that property is nonmarital. *Sellers v. Sellers, supra*. Our standard of review in this action for dissolution of marriage is de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Devney v. Devney*, 295 Neb. 15, 886 N.W.2d 61 (2016). In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions on the matters at issue. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013). With this standard of review in mind, based upon our de novo review of the record, we cannot say that the district court abused its discretion when it determined that these debts identified by Nanci were marital property and included them in the marital estate. We find no error with respect to this portion of the district court's decree.

Nanci additionally argues that the district court erred when it found that the marital estate was deficient in the amount of $52,960 and ordered that each party be responsible for half of the deficiency. Nanci contends that "[u]nder the relative economic circumstances of the parties, the trial court's order leads to grave economic inequities between the parties, resulting in an abuse of discretion." Brief for appellee on cross-appeal at 31. Because the district court's order dividing the marital estate is unclear, we cannot adequately address this argument.

As stated above, under the second step of the three-step process of the equitable divisions of property, the district court is to value the marital assets and marital liabilities of the parties. Under the third step, the district court is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. See *Sellers v. Sellers*, 294 Neb. 346, 882 N.W.2d 705 (2016). In its decree, the district court set forth a table which divided the assets between the parties and assigned the liabilities to Jay. However, the table set forth in the decree does not specify the value of any of these assets or liabilities.

In the paragraph titled "Equalization of Marital Estate," the district court offered this conclusory statement:

> Having equitably divided the marital estate, exclusive of [Jay's] Termination and Early Termination Payments, the Court finds that the resulting net value of the Parties' marital estate, is -$52,960.00 and that each party shall be responsible for fifty percent (50%) of such deficiency[.] The Court further finds that [Nanci's] portion of such deficiency shall be paid to [Jay] by reducing [Nanci's] interest in [Jay's] Termination Payments, as set forth hereinafter.

Because the district court did not specify the value of the assets and liabilities in the decree, it is not clear from the decree that the district court complied with the second and third steps of the three-step process. Under the circumstances, we cannot evaluate whether the equalization provision is proper.

We have treated the State Farm termination payments earlier in this opinion; with respect to the remainder of the marital estate, we reverse the portion of the decree dividing the marital property and remand the matter with directions to the district court to set forth the valuation of the parties' marital assets and marital liabilities and to clarify the basis for an equalization award, if any. Furthermore, based on our determination above that the district court erred when it

assigned a specific value to the termination payments, the value of any termination payments should not be included in the valuation of the marital estate and should not be considered by the district court when ordering an equalization payment, if any.

*Alimony.*

Nanci claims that the district court erred in its award of alimony to her, which provided that Nanci would receive $2,000 per month until Nanci reaches the age of 65, until she begins receiving her percentage of Jay's termination payments, until she remarries or dies, or until further order of the court, whichever occurs first. Nanci argues that Jay might not begin receiving his termination payments until after Nanci reaches the age of 65, which would create a gap between when Nanci stops receiving alimony and when she begins receiving her percentage of the termination payments. For this reason, Nanci asserts that her award of alimony should be modified so that it continues until the termination payments begin or until she dies or remarries. Because we believe that the court did not abuse its discretion, we find no merit to this assignment of error.

[7-10] The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in § 42-365 make it appropriate. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Id*. The ultimate criterion is one of reasonableness. *Id*.

In her appellate brief, Nanci notes that she is 57 years old and has limited earning power. Jay responds that Nanci will receive alimony of $2,000 per month for 7 years, at which point she will be eligible for Social Security. Considering the circumstances of this case, we determine that the district court did not abuse its discretion. Therefore, we find no merit to this assignment of error.

## CONCLUSION

We determine that the district court did not err when it determined that Jay's termination payments and extended termination payments under his contract with State Farm are marital property. However, we determine that the district court erred when it assigned a specific value to the termination payments. We further determine that the district court erred when it awarded Nanci 50 percent of the termination payments and extended termination payments, and we direct the district court to utilize the formula set forth above to calculate Nanci's percentage of the termination payments and extended termination payments.

We further remand this cause to the district court with directions to clarify its calculation of the marital estate and the equalization payment, if any. We also determine that the district court did not abuse its discretion in its award of alimony.

AFFIRMED IN PART AS MODIFIED, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.